UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STACI HIX-HERNANDEZ | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | NO: 1:20-cv-00029 |
| | § | |
| FORD MOTOR CO. | § | (Jury Demanded) |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

**COMES NOW**, Plaintiff, **Staci Hix-Hernandez** by and through her undersigned attorneys and states as follows:

### I.   PARTIES AND JURISDICTION

1.  Staci Hix-Hernandez, MD is a natural person and resident of the State of Texas.

2.  Defendant Ford Motor Co. is a corporation with its primary headquarters, residence, and place of incorporation in the State of Michigan. Defendant may be served with process through its registered agent, CT Corp System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

3.  This Court has jurisdiction of this cause of action pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000 and Plaintiff's state citizenship is completely diverse from Defendant's state citizenship. Venue is proper in the United States District Court, Western District of Texas, Austin Division because the automobile accident giving rise to the bodily injury and economic damages suffered by Plaintiff occurred in Williamson County, Texas.

## II.   FACTS

4    The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

5.    On January 10, 2018, Dr. Hix-Hernandez was returning home from dropping off her oldest child at school.  She was driving westbound in the 2600 block of W. University Avenue/State Highway 29 near the City of Georgetown in Williamson County, which has two lanes in either direction plus a middle turn lane.  The posted speed limit at that location is 65 miles per hour.  Dr. Hix-Hernandez was in the inside lane traveling at a safe speed and distance behind a tractor-trailer which was traveling in the same direction.  Due to factors beyond Plaintiff's knowledge and control, the tractor-trailer collided head-on but in an offset manner with a 2012 Ford F-150 vehicle (VIN 1FTFW1CFXCFA12009) that was traveling the opposite direction.  Plaintiff did not contribute to this collision and her vehicle was not directly involved in the initial collision.

6.    The collision between the tractor-trailer and F-150 resulted in the F-150's vehicle battery dislodging from that vehicle's engine compartment, becoming airborne, and crashing through Dr. Hix-Hernandez's windshield, striking her in the face.  The force of the battery's impact buckled and ripped off the headrest of her driver's seat and smashed into the child seat behind her where her youngest child normally would have been seated.  This was the very first time Dr. Hix-Hernandez had left her youngest child (then 2-years-old) at home with a caretaker instead of taking the child with her to drop off her oldest at school.

7.    Dr. Hix-Hernandez was momentarily knocked unconscious or otherwise incapacitated which resulted in her vehicle careening left and colliding with two other oncoming

vehicles. She could not have anticipated or avoided the primary collision, the battery which crashed through her windshield, or the subsequent collisions with the two other vehicles.

8. The F-150 vehicle battery was defectively secured within the engine compartment, as knowingly designed and manufactured by Ford Motor Co. The materials, components, and layout of the bolt system attached to the battery were defectively selected, of insufficient strength, poorly located, and defectively manufactured.

9. The collision between Plaintiff's head and battery almost killed her through blunt force trauma, and battery acid severely burned Plaintiff. Dr. Hix-Hernandez was hospitalized and underwent surgery for her injuries. She suffered facial fractures, a partially torn ear, chemical burns to her face, torso, arms, legs, and both eyes, skin and scalp lacerations, other soft tissue damage, physical pain and suffering, and severe emotional trauma.

10. After being discharged from the hospital, Dr. Hix-Hernandez was confined to her bedroom at home for three days because she was unable to adequately see to safely walk around her house. She was unable to even partially shower for four days. She was unable to wash the blood and acid out of her hair for five days. A full 10 days after the crash, Dr. Hix-Hernandez was finally able to have a complete shower.

11. The injuries sustained by Dr. Hix-Hernandez caused a substantial loss in her quality of life. Prior to her injuries, she was a healthy, active, thriving plastic surgeon, and mother of two. She had no limitations or restrictions. She was an avid golfer, runner, skier and snowboarder, and enjoyed fishing and boating with family and friends. Now, she faces life-long treatment for both physical and emotional injuries, the full extent of which remains unknown as do their long-term effects.

12. Dr. Hix-Hernandez suffered permanent facial disfigurement, permanent body disfigurement, permanent facial nerve damage, and has continuous pain in her scarred areas. She has hyperpigmented, hypertrophic scarring on her face where the battery hit her, crushed her cheek, and exposed the underlying bone. She has hypopigmented scarring on her forehead, hairline, face, ears, cheeks, lip, chin, neck, chest, left arm, and right leg as a result of the third-degree burns from the sulfuric acid from the battery. All of these scars are permanent and cannot be excised. She also has a hypertrophic scar on the nipple-areolar complex of her left breast which is both painful and disfiguring, and will require surgical removal (especially if she were to have another child and wanted to breastfeed as the scar will prevent latching). Furthermore, permanent nerve damage resulted in partial paralysis of her forehead asymmetry in her left brow and eyelid (which now droops). The crushing injury to her face also caused permanent volume damage in her cheek and neuromuscular discrepancies at multiple locations. To this day, Dr. Hix-Hernandez still often suffers from burning sensations in the facial scar. On operating days, these burning sensations are frequently exacerbated by her surgical mask and are disruptive and limiting to her productivity. All of these injuries resulted in great physical pain and suffering, and will require lifelong treatment.

13. Dr. Hix-Hernandez's eyes were so severely burned by the battery acid that she has permanent "dry eye," flattened irises, still suffers from eye fatigue, and occasionally has blurred or double vision. For weeks after the crash, she could not close her eyes at night because she was afraid of not being able to see. On the other hand, she could not keep her eyes open because they were constantly drying out and her vision was blurred. Daily treatment includes the application of serum tears every two to three hours. This requirement is especially disruptive to her work as a surgeon as she frequently has to "scrub-out," leave the operating room, apply the

serum tears, "scrub-in," and then complete the operation which oftentimes takes more than two to three hours. These regular and necessary eye treatments have severely limited Dr. Hix-Hernandez's work productivity in the operating room. She also must have punctal plugs inserted into her tear ducts every six months in order to prevent rapid drainage of tears from her eyes in attempt to keep them hydrated. Furthermore, she suffers from chronic eye fatigue. Her loss of full eye function and stamina negatively affects her potential work capacity because she must take significant time between cases to rehydrate her eyes, allow them time to rest, and can no longer operate at her full capacity as a surgeon. Prior to her injuries, Dr. Hix-Hernandez routinely performed 10-12 surgical hours per day, four days per week. Now, her operative days have been reduced to no more than eight surgical hours per day, two and a half days per week. Thus, her surgical work productivity has been greatly reduced because of the crash and her injuries. These eye injuries are permanent and will require lifelong treatments and expenses.

14. Professionally, Dr. Hix-Hernandez was unable to return to performing her minimum duties as a plastic surgeon for six weeks. This resulted in significant loss of earnings and bonuses due to her lost surgical productivity. She has not returned to her full, pre-crash work capacity and will never be able to do so. Dr. Hix-Hernandez remains limited at work by her non-apparent injuries—particularly the eye injuries caused by the battery acid and significant loss of sleep due to nightmares and emotional trauma. Her loss of quality sleep has reduced her physical stamina as compared to prior to the crash, which has also contributed towards her reduction of operative hours.

15. Almost 24 months after the crash, Dr. Hix-Hernandez still has recurring nightmares and sleepless nights. She attends regular therapy sessions just to be able to sleep and cope with the symptoms of post-traumatic stress disorder and emotional distress. The nightly

loss of sleep, vivid memories, and expansion of the trauma in her nightmares (to include her two young children—one of which was just in the car with her and the other which normally would have been with her on such a trip to school) have only slightly decreased since the crash, but recur with higher frequency during times of stress. These disruptive events currently happen three to four nights per week and greatly affect her, both personally and professionally. Regular therapy sessions and the use of self-redirection and calming techniques are foreseeable for the long-term.

16. As a prominent plastic surgeon, Dr. Hix-Hernandez's looks are oftentimes as important as her education, experience, and skills when seeing potential patients during consultations. Since the crash, she has had to wear theater-quality makeup and concealer to help hide her scars and burns. Despite her best efforts, however, she regularly has to explain her facial injuries to potential patients and relive the crash all over again. She also regularly endures intentional and unintentional cruelty from others caused by rude and derogatory comments regarding her appearance or dubious questions regarding her abilities because she is unable to fully remedy her own scars and injuries. The emotional toll and mental suffering are as painful as the physical injuries.

17. Plaintiff's vehicle, a 2017 Mercedes Benz CLS SV was damaged beyond value of repair by the impact of the battery, subsequent collisions, and the battery acid burns to the interior of the vehicle.

18. During treatment and recovery from the accident, Plaintiff accrued enormous medical bills and will accrue further financially crippling medical, surgical, and rehabilitative expenses for the remainder of her life. Before the accident, Plaintiff had built a highly successful

and profitable medical practice as a plastic surgeon. Her ability to practice medicine has been severely affected by the injuries she sustained.

19. The bolting mechanism used by Ford Motor Co. to attach the battery to the vehicle is not properly designed. The place of attachment is improperly located with respect to the battery's mass, allowing the battery to act as a lever against the bolting mechanism in a head-on collision. No restraining system of any kind attaches to the top or front of the battery. The bolting mechanism and attachment points are made of relatively low-strength materials and inadequately sized for the anticipated and foreseeable loading of the bolting mechanism during a head-on collision.

20. Economically feasible, safer alternative designs have existed for decades with respect to securing a vehicle battery in the engine compartment. Enclosed battery housings, metal straps, and adequately strengthened bolting mechanisms are all cost-effective, simple, and proven methods for reducing the risk that vehicle batteries will become deadly missiles during a vehicle collision. Such solutions to battery ejection are available for retail sale for less than $10.00. Wholesale costs of such solutions are far below that amount. The average new sale price of a F-150 such as the one involved in the accident exceeded $40,000.00 in 2012. Implementation of a safer alternative design that would have prevented Plaintiff's injuries would have increased the sales price of the vehicle by less than $1/40^{th}$ of 1 percent (0.025%).

21. Ford Motor Co. has long been aware that batteries can eject from engine compartments during collisions injuring the occupants of the vehicles involved and bystanders, but Ford Motor Co. has failed to address this defective condition for either its own financial gain or through callous disregard to human life and suffering.

22.     Ford Motor Co.'s malfeasance has forever harmed and diminished Plaintiff's life. Ford Motor Co. should be held accountable for its actions both to reimburse Plaintiff for her damages and to encourage Ford Motor Co. to design and manufacture vehicles in a responsible and safe manner.

### III.    CAUSES OF ACTION

23.     The allegations of the preceding and succeeding paragraphs are incorporated herein by this reference.

*Strict Liability*

24.     Ford Motor Co. designed, manufactured, supplied and marketed the vehicle that caused Plaintiff's injuries and contained a defective condition (a defectively secured vehicle battery) that was unreasonably dangerous to persons whom Ford Motor Co. could reasonably expect to use or be harmed by foreseeable use or misuse of the vehicle..  The vehicle was defectively designed, defectively manufactured, and failed to warn the user of the dangers associated with operation of the vehicle.  Economically feasible, safer alternative designs were readily available and widely known at the time the vehicle was designed, manufactured, and marketed.  The defective condition of the vehicle caused Plaintiffs' injuries.

25.     The vehicle's product defects constitute a new and independent, or superseding, cause of injury to Plaintiff that intervened between the negligence, if any, of the drivers of the tractor-trailer and F-150 vehicles and the final injuries to Plaintiff.

26.     Ford Motor Co. is engaged in the business of supplying/manufacturing vehicles for highway use, and the vehicle in question was expected to and did reach the user without substantial or relevant change of its condition when it left Ford Motor Co.'s control.

*Negligence*

27. At all relevant times to this cause of action, Ford Motor Co. owed a duty to exercise ordinary care in the design, manufacture, and/or supply of the vehicle involved in the incident made the basis of this suit. Ford Motor Co.'s duty extended to all those who could reasonably be expected to be harmed by foreseeable use or misuse of the vehicle, including but not limited to Plaintiff.

28. Ford Motor Co. breached this duty and was negligent. Ford Motor Co.'s negligent acts and/or omissions include but are not limited to the following:

    a. In failing to safely design the vehicle to avoid foreseeable risks of harm;

    b. In failing to safely manufacture the vehicle including assembly and component selection;

    c. In failing to properly test and inspect the vehicle for defects that created a reasonably foreseeable risk of harm; and

    d. In failing to provide adequate warnings for the safe use of the vehicle, including the importance of battery securement.

29. Each of the above acts and/or omissions were singularly and/or cumulatively a proximate cause of the occurrence in question and the resulting injuries and damages sustained by Plaintiff.

30. Defendant's negligence constitutes a new and independent, or superseding, cause of injury to Plaintiff that intervened between the negligence, if any, of the drivers of the tractor-trailer and F-150 vehicles and the final injuries to Plaintiff.

*Gross Negligence / Exemplary Damages*

31. Further, the acts and omissions of Ford Motor Co, were grossly negligent because such acts and omissions, when viewed objectively from the standpoint of Defendant at the time of their occurrence, involved an extreme degree of risk, considering the probability and

magnitude of the potential harm to others. Defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.  Consequently, Plaintiff is entitled to and hereby seeks recovery of exemplary damages from Defendant in the maximum amount allowable by law.

*<u>Vicarious Liability</u>*

32. Ford Motor Co. is vicariously liable for the damages proximately caused to Plaintiff by virtue of the negligent and wrongful conduct of its representatives and employees who acted within the course and scope of their employment when designing, manufacturing, supplying, and marketing the vehicle.  The actions of Ford Motor Co.'s employees and representatives caused and proximately caused Plaintiff's injuries and damages.  Therefore, Defendant is vicariously liable to Plaintiffs for the negligent acts and/or omissions of its employees and representatives on the basis of *respondeat superior*.

## IV.   DAMAGES

33. As a direct and proximate result of Defendant's acts and omissions, Plaintiffs seek all damages against Defendant to which she is entitled.   Plaintiff's damages are increasing and not fully known at this time but greatly exceed $10,000,000.  Plaintiff's damages include, but are not limited to:

 a. Plaintiff's past and future medical expenses;
 b. Plaintiff's past and future lost wages;
 c. Plaintiff's past and future pain and suffering;
 d. Plainitiff's past and future mental anguish;
 e. Plaintiff's disfigurement;

    f.    Damage to Plaintiff's vehicle; and

    g.    Exemplary damages.

## V.    JURY DEMAND

34.    Plaintiff hereby demands a trial by jury.

## PRAYER

Plaintiff prays that Defendant be cited to appear and answer herein, and that upon final hearing of this cause, Plaintiff have judgment against Defendant granting the following relief:

    a.    Recovery of a reasonable monetary award or awards as compensatory damages, in amounts and to the extent to be proven at trial;

    b.    Exemplary damages in an amount sufficient to deter future wrongful conduct of this nature;

    c.    Prejudgment and post-judgment interest thereon at the maximum rate and earliest date allowed by law;

    d.    Plaintiff's costs in the action; and

    e.    Such other and further relief to which she may be justly entitled.

                                    Respectfully submitted,

                                    McClesky Harriger Brazill & Graf, LLP
                                    5010 University Ave., 5th Floor
                                    Lubbock, Texas 79413
                                    Phone: (806) 796.7300
                                    Fax:    (806) 796.7365

                                    /s/ William P. Lane
                                    WILLIAM P. LANE
                                    Texas State Bar No. 11888250
                                    blane@mhbg.com
                                    MARION SANFORD III
                                    Texas State Bar No. 24027828
                                    (pro hac vice pending)
                                    rsanford@mhbg.com

OF COUNSEL:

The Musick Law Firm
P.O. Box 29685
Austin, Texas 78755
Phone: (512) 693.7776
Fax:    (512) 593.5299

/s/ Houston Todd Musick
HOUSTON TODD MUSICK
Texas State Bar No. 24076581
(pro hac vice pending)
htmusick@themusicklawfirm.com

                                    ATTORNEYS FOR PLAINTIFF