## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **STACI HIX-HERNANDEZ,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL NO. 1:20-CV-00029-RP** |
| | § | |
| | § | |
| **FORD MOTOR COMPANY,** | § | |
| *Defendant* | § | |

### ORDER

Before the Court are Defendant Ford Motor Company's FRE 702 Motion to Exclude Dr. Jahan Rasty's Testimony, filed March 22, 2022 (Dkt. 52); Plaintiff's Response, filed June 13, 2022 (Dkt. 62); Defendant's Reply, filed June 20, 2022 (Dkt. 65); Plaintiff's Motion for Leave to File Sur-Reply, filed June 29, 2020 (Dkt. 69); and Defendant's Response in Opposition to Plaintiff's Motion for Leave to File Sur-Reply (Dkt. 70), filed June 30, 2022. The District Court referred the Motion to Exclude and related filings to the undersigned Magistrate Judge for disposition, pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

The Court first addresses Plaintiff's motion for leave to file a Sur-Reply to Defendant's Motion to Exclude. "Although surreplies 'are heavily disfavored,' it is within the sound discretion of the courts to grant or deny leave to file such additional briefing." *Mission Toxicology, LLC v. Unitedhealthcare Ins. Co.*, 499 F. Supp. 3d 350, 359 (W.D. Tex. 2020) (quoting *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 751 n.2 (5th Cir. 2014)). Because Hix-Hernandez responds to arguments Ford raised in its Reply, the Court finds that she has presented good cause to file a sur-reply. *See Mission Toxicology*, 499 F. Supp. 3d at 360 (granting leave to file where sur-reply "does not rehash arguments already presented in the response."). Accordingly, the Court **GRANTS** Plaintiff's Motion for Leave (Dkt. 69).

## I.   General Background

On the morning of January 10, 2018, Staci Hix-Hernandez, M.D., was driving her 2017 Mercedes Benz GLS 63 Sport Utility Vehicle ("SUV") westbound behind a Freightliner tractor-trailer on State Highway 29 in Georgetown, Texas. Hix-Hernandez's First Amended Complaint, Dkt. 47 ¶ 5. Elizabeth Allen was driving her 2012 Ford F-150 truck (the "F-150") in the opposite direction when she crossed into the westbound lanes and crashed into the tractor-trailer. Hix-Hernandez alleges that "[t]he collision between the tractor-trailer and the F-150 resulted in the F-150's vehicle battery dislodging from that vehicle's engine compartment, becoming airborne, and crashing through Dr. Hix-Hernandez's windshield, striking her in the face." *Id.* ¶ 47. After Hix-Hernandez was knocked unconscious, her car veered left and collided with two other oncoming vehicles. Hix-Hernandez alleges that she suffered serious personal injuries in the accident, including "facial fractures, a partially torn ear, chemical burns to her face, torso, arms, legs, and both eyes, skin and scalp lacerations, other soft tissue damage, physical pain and suffering, and severe emotional trauma." *Id.* ¶ 9.

On January 9, 2020, Hix-Hernandez filed this product liability lawsuit against Ford, alleging claims of strict liability design defect, negligent design, gross negligence/exemplary damages, and vicarious liability. She alleges that: "The F-150 vehicle battery was defectively secured within the engine compartment, as knowingly designed and manufactured by Ford Motor Co. The materials, components, and layout of the bolt system attached to the battery were defectively selected, of insufficient strength, and poorly located." Dkt. 47 ¶ 8. Hix-Hernandez alleges that Ford's design of the battery restraint system in the F-150 was flawed "because it only secured the battery with a small plastic 'foot clamp' rather than the more robust metal 'cross member' design used ubiquitously by Ford in its F-250 and F-350 models." Dkt. 62 at 1-2.

2

On October 18, 2021, Hix-Hernandez designated Jahan Rasty, Ph.D., as her design defect expert witness to offer testimony on the design of the battery restraint system used in the F-150 involved in the accident. Dkt. 44 at 3. Ford moves to exclude Dr. Rasty's testimony under Federal Rule of Evidence 702, arguing that it is unreliable, not based on sufficient facts or data, and not helpful to the jury.

## II.  Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that scientific testimony or evidence is not only relevant, but also reliable. Rule 702 of the Federal Rules of Evidence was later amended to provide that a witness

> qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-95). The proponent of expert testimony bears the burden of establishing the reliability of the testimony. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016).

Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that the testimony is reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Trial courts ordinarily apply four factors when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability is flexible, and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho Tire*, 526 U.S. at 141.

When conducting a *Daubert* analysis, the trial court's main focus should be on determining whether the expert's opinion will assist the trier of fact. *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). Assisting the trier of fact means "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). But the "helpfulness threshold is low: it is principally . . . a matter of relevance." *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 459 n.14 (5th Cir. 2013).

The court's role under Rule 702 "is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Puga*, 922 F.3d at 294. The trial court's role as a "gatekeeper" under *Daubert* "is not intended to serve as a replacement for the adversary system." *Pipitone v. Biomatrix, Inc.*, 288

F.3d 239, 250 (5th Cir. 2002). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Puga*, 922 F.3d at 294 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment). As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility. *Id.*

### III. Analysis

The crux of Hix-Hernandez's case is that Ford defectively designed the battery restraint system used in the F-150 involved in the underlying accident. Hix-Hernandez alleges that the battery restraint system failed and the battery was ejected when the F-150 crashed into the side of the tractor-trailer, causing her injuries. Ford argues that the battery was not ejected until the F-150 crashed into Hix-Hernandez's SUV after it had collided with the tractor-trailer twice, first with the drive axle of the tractor, then again with the axle of the trailer being pulled by the tractor.

Under Texas law, to recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009) (citing TEX. CIV. PRAC. & REM. CODE § 82.005 (West 1993)). A product is unreasonably dangerous when its risk outweighs its utility. *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 6 (Tex. 2015). "A safer alternative design is one that would have prevented or significantly reduced the risk of the injury, would not substantially impair the product's utility, and was economically and technologically feasible at the time." *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 82.005(b)).

> In Texas, the plaintiff must show the safety benefits from the proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety. The burden is minimal: plaintiffs need only offer *some* evidence that their alternative design would not have introduced other dangers of equal or greater magnitude.

*Sims*, 839 F.3d at 406 (cleaned up). Expert testimony "'is generally encouraged if not required to establish a products liability claim.' In particular, expert testimony is crucial in establishing that the alleged design defect caused the injury." *Sims*, 839 F.3d at 409 (quoting *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42 (Tex. 2007)).

Hix-Hernandez designated Rasty as an expert witness to provide testimony on the design of the battery restraint system used in the F-150 involved in the incident. Ford argues that Rasty's testimony should be excluded because he did not perform an accident reconstruction but relied solely on his laboratory tests in forming his opinions, and because his opinions are inconsistent with the facts of the case.

## A. Dr. Rasty's Report

Rasty is a tenured professor in the Department of Mechanical Engineering at Texas Tech University and the Director of that department's Materials Performance and Failure Analysis Laboratory. Hix-Hernandez hired him to perform a forensic engineering evaluation of the foot-clamp battery retention system used in Ford's 2012 F-150 pickup trucks and the crossmember battery retention system used in Ford's 2012 F-250 trucks, and to opine as to whether the crossmember design used in the F-250 would have prevented the battery from penetrating Hix-Hernandez's windshield. Dkt. 62 at 2.

Rasty issued his "Forensic Engineering Evaluation of the Effectiveness of Two Battery Restraint Designs for Battery Containment" report (the "Report") on October 18, 2021. Dkt. 62-1. Based on his laboratory experiments on the two battery restraint systems, a review of "relevant

discovery documents," and "observations contained in this report," including police reports, Rasty

concluded that

> an alternative battery restraint design (*i.e.,* the crossmember design),
> which is known to Ford and is used ubiquitously in its F-250, F-350,
> and other model pickup trucks, is significantly more effective than the
> foot-clamp design (as used in the Subject Vehicle [the F-150]) in
> performing its intended design function of keeping the battery within
> the engine bay. Such crossmember battery restraint design would have
> likely prevented the Subject Battery from either striking Dr. Hix-
> Hernandez' vehicle or penetrating into its interior space during the
> Subject Collision.

Dkt. 62-1 at 4.

In his Report, Rasty explained that he performed 14 laboratory experiments on the F-150 and

F-250 battery restraint systems at three different angles "to quantify the load necessary to separate

the battery from it respective restraint system." *Id.* Rasty described the experiments as follows:

> The test set up, as shown in *Figure 9*, consisted of a hydraulic press
> which was sued as a source of an increasing load applied through
> intermediate connections to the battery in order to simulate the inertial
> forces experienced by the battery during a collision. Once the battery
> was secured within its battery restraint system, the assembly was
> secured to a rigid plate to simulate the connection of the battery tray to
> the chassis. The design of the rigid plate allowed for adjustment of its
> inclination angle with respect to the movement direction of the
> hydraulic press' ram. A load cell was used to measure the load applied
> during testing until the restraint system failed.

*Id.* at 16.

Rasty states that his tests demonstrate that "the crossmember design can withstand significantly

larger forces than the foot-clamp design before failure." *Id.* at 21. Specifically, the tests showed

that the cross-member alternative design was 232% stronger than the foot-clamp design at 90

degrees, 79% stronger at 25 degrees, and 25% stronger at a 15-degree angle configuration. *Id.* at

23. In addition, Rasty states that there was a significant difference between the failure mechanisms

of each design: "[U]nlike the foot-clamp design, the crossmember design itself did not fail during

the observed tests and continued to retain the battery through test completion." *Id.* at 21. Thus, Rasty opined that, "in the event of battery ejection, a vehicle with the crossmember restraint system design would be more likely to eject the combined battery/battery tray assembly, which more likely than not, would influence the energy with which the battery would be escaping the vehicle and its projected trajectory path." *Id.* In addition to the test results and his education and experience, Rasty states that he based in his opinions on the following documents: schematics of the battery restraint system parts; police reports of the accident; eyewitness testimony; Hix-Hernandez's allegations; post-accident photographs of the F-150 and Hix-Hernandez's vehicle; and on-scene accident photographs. *Id.* at 27.

## B.  Lack of Accident Reconstruction

Ford's primary argument for excluding Rasty's report is that he failed to conduct an accident reconstruction, which "renders every opinion he offers in this case as unreliable." Dkt. 52 at 8. Ford contends that:

> Dr. Rasty never undertook to calculate a single force imparted on the vehicles or the battery retention system in the accident. Without an accident reconstruction, he is merely *guessing* at the forces that were applied to the F-150 and the battery retention components in the subject accident. Without any knowledge of any forces generated in the subject accident, he simply cannot reliably or scientifically apply his experiment results to what happened in this accident, or what would have happened with the alternate battery system.

Dkt. 52 at 8.

It is undisputed that Rasty was hired by Hix-Hernandez as a design defect expert, not an accident reconstruction expert. Dkt. 62-2 at 12:13-15, 39:11-12; Dkt. 52 at 8.[1] Ford cites no authority requiring a design defect expert to perform an accident reconstruction in a product

---

[1] Rasty testified at deposition that he teaches college courses on accident reconstruction and considers himself qualified on the matter. Dkt. 62-2 at 39:6-10.

liability case to testify regarding safer alternative designs. "[A] design defect, if it exists, is a constant that is unaffected by the accident equation." *Greco v. Ford Motor Co.*, 937 F. Supp. 810, 814 (S.D. Ind. 1996). Rasty performed 14 different laboratory experiments on the two battery retention systems at issue. *See* Dkt. 62-1.

> "Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." This testing need not entail actually constructing a model [ ]; testing can be as simple as applying math and physics to establish the viability of a design.

*Sims*, 839 F.3d at 407 (quoting *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 332 (5th Cir. 2014)).[2]

In *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex. 1999), the defendant argued that alternative designs for automobile transmissions suggested by the plaintiff's expert were inadequate to prove a reduction in the risk of injury because the designs were never tested and, therefore, the expert's opinion was pure speculation. The Texas Supreme Court rejected this argument, stating that "the plaintiffs did not have to build and test an automobile transmission to prove a safer alternative design. A design need only prove 'capable of being developed.'" *Id.* at 592; *see also Matak*, 462 S.W.3d at 7 ("This design need not be actually built and tested; a plaintiff must show only that the alternative design was 'capable of being developed.'"). The *Sanchez* court relied on the following comment from the Restatement (Third) of Torts: Products Liability § 2 cmt. f (1998): "qualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale." *Id.* The court found that the expert's

---

[2] Ford relies on *Casey* to support its argument that Rasty's testimony should be excluded. Ford's reliance on *Casey* is misplaced because the expert in *Casey* performed no testing comparing the accident vehicle's airbag to that of the proposed alternative airbag. 770 F.3d at 332. Here, Ford does not dispute that Rasty tested the battery retention systems.

testimony was reliable because the expert "explained in some detail how his proposed design would make the transmission safer" and testified about the engineering principles underlying his proposed design. *Id.; see also Riley v. Ford Motor Co.*, No. 2:09-CV-148-KS-MTP, 2011 WL 2728266, at *6 (S.D. Miss. July 12, 2011) (finding that failure to conduct tests of alternative design "is not, by itself, sufficient to bar [expert's] testimony").

Here, unlike in *Sanchez*, Rasty conducted a series of 14  laboratory experiments on the battery restraint systems in 2012 F-150 and F-250 vehicles. Dkt. 62-1 at 2, 4. Each battery restraint system was subjected to increased external loads until the battery either slipped out of the restraint or the connections between the battery tray and the simulated chassis were compromised. *Id.* at 16. Rasty performed these experiments at three different angles. *Id.* He used a hydraulic press as a source of an increasing load applied through intermediate connections to the batteries to simulate the inertial forces experienced by a battery during a collision. *Id.* Rasty also explained the engineering principles underlying those experiments in his Report. Clearly, this is not a case where "no testing" was performed. *Gamboa v. Centrifugal Casting Mach. Co.*, No. CIV.A. H-14-1273, 2015 WL 6835359, at *9 (S.D. Tex. Nov. 6, 2015).

The Court finds that Rasty performed sufficient testing on his safer alternative design theory to testify as to those results. *See Aggarwal v. Toyota Motor Corp.*, No. A-17-CV-247-LY, 2020 WL 1942781, at *3 (W.D. Tex. Mar. 9, 2020) (holding that expert's opinions were reliable where opinions were based on application of math and physics to previously run tests and data). Ford does not explain how the failure to perform an accident reconstruction undermines Rasty's methodology in the experiments he did perform. Ford, of course, is free to raise the absence of an accident reconstruction on cross-examination.

### C.  Dr. Rasty's Design Defect Opinions are Reliable

Ford next argues that Rasty's design defect opinions are unreliable because he has never worked for an automotive manufacturing company or designed a component part for a production automobile, and bases his opinions "on nothing more than his laboratory experiments on the 2012 F-150 foot-clamp design versus the 2012 F-250 cross-member design." Dkt. 52 at 12.

### 1.  Dr. Rasty is Qualified

Rasty earned a Ph.D. in mechanical engineering in 1987 from Louisiana State University and an MBA from Texas Tech University in 1999. Dkt. 62-1 at 28. He has been a full tenured professor in the Department of Mechanical Engineering at Texas Tech University since 2008. *Id.* at 32. Rasty is the Program Director for Forensic Engineering Accident Investigation and the Director of the Mechanical Engineering Department's Materials Performance and Failure Analysis Laboratory at Texas Tech University. *Id.* at 28. Since 1986, Rasty also has been the president of Real-World Forensic Engineering, which performs engineering analysis and provides expert witness testimony and consulting services in the areas of forensic engineering, mechanical design, failure investigation, stress analysis, materials characterization/testing, and experimental engineering analysis. *Id.* at 31.

"A lack of personal experience . . . should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702: 'knowledge, skill, experience, training, or education.'" *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) (quoting FED. R. EVID. 702). Thus, "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.* at 168-69 (quoting *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir.1991); *see also Clay v. Ford Motor Co.*, 215 F.3d 663, 668

(6th Cir. 2000) (permitting accident reconstruction expert to testify although he never worked in automobile manufacturing industry); *Zoch v. Daimler, A.G.*, No. 4:17-CV-578, 2018 WL 4610569, at *2 (E.D. Tex. Sept. 25, 2018) (rejecting automobile manufacturer's argument that expert lacked necessary background to testify as to seat designs although expert "never worked for an automobile manufacturer and has never been involved in the design of vehicle seats or structures for commercial vehicles").

Accordingly, the fact that Rasty never worked in the automotive industry does not render him unqualified to testify regarding his own mechanical engineering experiments on the battery restraint systems at issue. The Court concludes Rasty possesses the necessary background, training, education, and experience to testify regarding the battery restraint systems in this case.

### 2. Bases of Dr. Rasty's Opinions

Ford next argues that Rasty's opinions are unreliable because his opinions are based on nothing more than his laboratory experiments on the 2012 F-150 foot-clamp design versus the 2012 F-250 crossmember design. Ford complains that Rasty has not identified any incidents in which a battery secured by the foot-clamp design came loose from a vehicle during an accident. Ford contends that: "Relying on one set of laboratory tests that Rasty cannot relate to any real-world accident is not a scientifically valid methodology for rendering an opinion that every one of the millions of 2012 F-150s on the road is unreasonably dangerous and defectively designed." Dkt. 52 at 12.

As he explained in his Report, in addition to his experiments, Rasty based his opinions on the schematics of the battery restraint system parts as displayed on the Ford website; police reports and police narratives of the accident; eyewitness testimony; Hix-Hernandez's allegations; post-accident photographs of the F-150 and Hix-Hernandez's vehicle; and on-scene accident photographs. Dkt. 62-1 at 27.

While evidence of similar incidents may be relevant to show whether a product is unreasonably dangerous, *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 138-39 (Tex. 2004), it appears that Texas law does not require evidence of similar accidents to sustain a design defect claim. *Gamboa*, 2015 WL 6835359, at *6 ("[T]he court is not aware of any case holding that evidence of similar accidents is required to sustain a design defect claim. To the contrary, Texas case law suggests that the frequency of similar accidents is not alone dispositive of the unreasonable dangerousness inquiry."); *see also Uniroyal*, 977 S.W.2d at 337 ("While [evidence of few reported accidents] is certainly relevant, and perhaps would persuade many juries, we cannot say that it conclusively establishes that the tire is reasonably safe when weighed against the other evidence."). Thus, while Ford may cross-examine Rasty about the absence of similar accidents, that is not a basis to reject his testimony. *See Gamboa*, 2015 WL 6835359, at *6 (rejecting defendant's argument that plaintiffs could not prove centrifugal casting machine was unreasonably dangerous where plaintiffs did not identify any similar accidents with the machine).

Ford also points out that Rasty did not examine, test, inspect, measure, analyze, or photograph the vehicles involved or their component parts, and did not inspect the accident scene in preparing his Report. But it is undisputed that the vehicles involved in the collision and the F-150's battery retention system components were not preserved and therefore were unavailable. Dkt. 52 at 8-9; Dkt. 62 at 3. Courts have found that a design expert's failure to inspect the vehicle involved in the underlying accident is not grounds for excluding that expert's testimony where it is based on other reliable methodology. *See Clay*, 215 F.3d at 668 (finding that expert's failure to inspect the vehicle involved in the accident and his late visit to the accident site did not undermine his methodology or render his testimony about the accident inadmissible).

Ford also asserts that Rasty's opinions are unreliable because he did not rely on Ford's own documents, engineering standards, design guidelines, or tests. Hix-Hernandez contends that Rasty did not rely on such documents because Ford had not produced them before Rasty issued his Report. Dkt. 62 at 13. Ford disputes this and points out that Hix-Hernandez did not file a motion to compel. Dkt. 65 at 4-5. In her Sur-Reply, Hix-Hernandez continues to allege that Ford failed to produce the relevant documents before Rasty issued his Report. Dkt. 69-1 at 6.

Whether or not Ford produced the relevant documents before Rasty issued his Report, Ford's argument is not persuasive. It was unnecessary for Rasty to rely on Ford's documents for his Report to be reliable. As noted, Rasty used Ford's brake restraint systems in his laboratory tests. In addition, Rasty relied on the crossmember alternative design, which has been used in Ford's F-250 trucks for more than a decade, as well as other relevant evidence and documentation outlined in his Report. The Court finds that failing to use Ford's own documents in his analysis of the brake restraint systems does not render Rasty's Report unreliable. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

### D. Dr. Rasty's Causation Opinions

Finally, Hix-Hernandez and Rasty contend that the battery was ejected from the F-150 when it collided with Hix-Hernandez's vehicle at a speed of 65 mph. Hix-Hernandez and Rasty also allege that the battery was intact when it hit Hix-Hernandez's windshield. Ford argues that these opinions are unreliable because they are "fatally inconsistent with the facts of the case." Dkt. 52 at 6. Relying on its retained expert, Ford alleges that the F-150 was subjected to three severe collisions during the accident and that the battery was not ejected until the F-150 collided with

Hix-Hernandez's SUV at a speed of more than 100 mph. Ford's expert also claims that the battery broke apart before it hit Hix-Hernandez's windshield.

This is Ford's version of the facts, based on its own expert's opinions. Such disputed fact issues must be decided by the jury. *Huyser v. Ford Motor Co.*, No. 2:13-CV-280-RSP, 2015 WL 296075, at *1 (E.D. Tex. Jan. 21, 2015). The court's role as a gatekeeper under *Daubert* "is not intended to serve as a replacement for the adversary system." *Pipitone*, 288 F.3d at 250. The Court must not "weigh the expert testimony to the point of supplanting the jury's fact-finding role." *Puga*, 922 F.3d at 294. Once again, Hix-Hernandez "need not prove to the judge that the expert's testimony is correct," only that it is reliable. *Moore*, 151 F.3d at 276.

## IV. Conclusion

For the foregoing reasons, Defendant Ford Motor Company's FRE 702 Motion to Exclude Dr. Jahan Rasty's Testimony (Dkt. 52) is **DENIED**.

As stated above, Plaintiff's Motion for Leave to File Sur-Reply to Defendant's Motion to Exclude Dr. Jahan Rasty's Testimony (Dkt. 69) is **GRANTED**.

It is **FURTHER ORDERED** that the Clerk **REMOVE** this case from the Magistrate Court's docket and **RETURN** it to the docket of the Honorable Robert Pitman.

**SIGNED** on July 25, 2022.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE