IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STACI HIX-HERNANDEZ, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:20-CV-29-RP |
| FORD MOTOR COMPANY, | § § § | |
| Defendant. | § § | |

### ORDER

From March 27 to March 28, 2023, this case came before the Court for a jury trial. After the close of Plaintiff Staci Hix-Hernandez's ("Plaintiff") case, Defendant Ford Motor Company ("Ford") made an oral motion for judgment as a matter of law pursuant to Rule 50(a). The Court heard oral arguments on the motion and granted it on the record. The Court now issues this written order, setting forth the reasons for granting Defendant's motion.

### I. BACKGROUND

This case arises from a high-speed, multi-vehicle accident on January 10, 2018, on State Highway 29 in Georgetown, Texas. Elizabeth Anne Allen was driving her 2012 Ford F-150 eastbound. Plaintiff Staci Hix-Herandez was driving her 2017 Mercedes Benz GLS 63 westbound behind a 2005 Freightliner tractor-trailer. Allen drove into the westbound lane and collided with the oncoming Freightliner. Both vehicles were estimated to be driving around 65 miles per hour in opposite directions at the time of the crash, resulting in a substantial net impact of 130 miles per hour. After the initial impact, the F-150 then collided again, first with the Freightliner tractor and then with Plaintiff's Mercedes, resulting in three total 100+mph collisions.[1] At some point during

---

[1] Plaintiff's witness Dr. Jahan Rasty disputed at trial whether the third collision happened.

1

the second or third collision, the F-150's battery parts became airborne and penetrated the windshield of Plaintiff's Mercedes, damaging her eyes and scarring her face.

On January 9, 2020, Plaintiff sued Ford, alleging a defective design of the F-150's battery retention system. (Compl., Dkt. 1). The core of Plaintiff's claim is that Ford's battery retention system was unreasonably dangerous and led to the battery becoming dislodged during the crash, which caused the injuries to her face. (Am. Compl., Dkt. 47, at 1). She alleges that Ford's foot-clamp design, which holds the battery in place at the bottom, was less safe than a cross-member design, which holds the battery in place via metal bars that cross the battery over its top. (*Id.* at 7).

At trial, Plaintiff presented three relevant witnesses to her design defect claims: (1) Georgetown Peace Officer Matthew Robey, (2) Officer Matthew Fogle, (3) and most crucially, her expert witness, Dr. Jahan Rasty.[2] None of the witnesses, however, directly saw or reconstructed the accident. As they were not designated as experts in accident reconstruction, Officers Robey and Fogle were permitted to testify as to what they saw responding to the scene of the accident but not reconstruct the events or discuss the timing of the battery's ejection. (Minute Entry, Dkt. 108 (granting Defendant's motion in limine (Dkt. 88-12))). Plaintiff herself did not know when the battery was ejected.[3] Body camera footage from the scene of the accident showed auto parts laid across the highway, and at least one officer identified a piece lying in the street as a part of the battery that had penetrated Plaintiff's windshield. (Scurlock Body Cam, Dkt. 118-60, at 0:05).

Plaintiff's witness, Rasty, was only designated as an expert to discuss the effectiveness of the battery retention system and could not offer expert opinions on the timing of the battery's ejection. Rasty tested the strength of Ford's foot-clamp design against a cross-member design by using a

---

[2] Plaintiff presented two witnesses who testified on damages. Plaintiff also had Ford's corporate representative, Jennifer Buckman, briefly testify as to Ford's battery design.
[3] At the scene of the accident, Plaintiff told a responding officer, "I looked up and a car was there. I have no idea what happened." (Scurlock Body Cam, Dkt. 118-59, at 0:50–1:03).

hydraulic press on the battery retention system at 15-, 25- and 90-degree angles until the battery became dislodged. (Order, Dkt. 73).[4] Rasty's experiments showed that the cross-member design sustained 232% more force at 90-degrees, 79% more force at 25 degrees, and 25% more force at 15 degrees. (*Id.* at 7). However, because Rasty based his experiments off only what he had learned from the officers and Plaintiff about the accident, he did not replicate the exact forces involved in the accident. (*Id.*). In his deposition, Rasty stated that "the battery entered intact" into Plaintiff's Mercedes. (Rasty Depo., Dkt. 52-4, at 64). Upon cross-examination at trial, Ford introduced body camera footage where the responding peace officers discussed seeing battery parts on the street, implying that the battery could not have entered the Mercedes intact. (Scurlock Body Cam, Dkt. 118-60, at 0:05). After seeing the video, Rasty walked back his original testimony about the battery "enter[ing] intact," stating that he believed the battery may have broken up upon penetrating the windshield.

At the close of Plaintiff's case, Ford made an oral motion for judgment as a matter of law. Ford made several arguments: (1) that design defect claims do not entail a duty to protect bystanders (i.e., non-consumers); (2) that Plaintiff failed to introduce evidence showing the battery was properly secured at the time of its ejection, and (3) that Rasty's testimony failed to show a safer alternative design and that the alleged defect was the producing cause of Plaintiff's injuries. The Court heard arguments from both sides before granting the motion on the record. The Court requested Ford submit a written motion for the record, which it filed the same day. (Mot. JMOL, Dkt. 126).

## II. LEGAL STANDARD

Judgment as a matter of law is proper "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary

---

[4] In the experiments, a 0-degree angle would be a head-on horizontal collision, while a 90-degree angle would be an upward force from (i.e., perpendicular to) the ground.

3

basis to find for the party on that issue." Fed. R. Civ. P. (50)(a)(1); *Casey v. Toyota Motor Engineering Manufacturing North Am. Inc.*, 770 F.3d 332, 326 (5th Cir. 2014). The decision to grant a Rule 50 motion is "a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994). To prevail on a Rule 50 motion, "the party opposing the motion must at least establish a conflict in substantial evidence on each essential element of [its] claim." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039 (5th Cir. 2011)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 485 (5th Cir. 2017)).

### III. DISCUSSION

Ford raises three core arguments: (1) that design defect claims do not entail a duty to protect bystanders (i.e., non-consumers); (2) that Plaintiff failed to introduce evidence showing the battery was secured at the time of the accident or was the producing cause of the accident, and (3) that Rasty's testimony failed to show a safer alternative design that would have prevented the injuries. Because the Court finds that Plaintiff has not met her burden regarding causation and design defect, it will not address Ford's argument that it owed no duty to other drivers on the road with regards to its battery clamp design.

#### A. Condition of the Battery Retention System

Because Plaintiff introduced no evidence showing that the battery retention system was in substantially the same condition as when it left Ford's possession, she did not meet her burden in a design defect case. "In Texas, [S]ection 402A of the Restatement (Second) of Torts governs claims for strict liability in tort." *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996) (citing

4

*Lubbock Mfg. Co. v. Sames*, 598 S.W.2d 234, 236 (Tex. 1980)). Section 402A provides that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user or consumer [if] it is expected to and does reach the user or consumer *without substantial change in the condition in which it is sold.*" Restatement (Second) of Torts, § 402A(1)(b) (emphasis added).

Texas law incorporates Section 402A's requirement that strict liability only applies if the product has not been changed. *Barajas*, 927 S.W.2d at 613 ("[T]he product must reach the user or consumer without substantial change in the condition it left the manufacturer's or seller's possession."); *Armstrong Rubber Company v. Urdiquez*, 570 S.W.2d 374, 375 (Tex. 1978) ("The product . . . must reach the user in essentially the same condition as when it left the seller's possession."). The Texas Pattern Jury charge asks, "Was there a design defect in the automobile *at the time it left the possession* of [the defendant] that was a producing cause of the occurrence in question?" Texas Pattern Jury Charge 71.4 ("Design Defect") (2020) (emphasis added).

A reasonable jury could not find that the battery retention system was in a substantially similar condition for two reasons. First, there was no evidence offered as to the state of the F-150 just before the crash. The F-150 was not preserved nor were its components. Plaintiff introduced no evidence documenting the history of the F-150 or the maintenance on its battery and engine components. The battery parts themselves were not preserved. The F-150 left Ford's possession in 2012 but the accident did not occur until 2018. Indeed, there was no evidence that the battery at issue was even the original F-150's battery, as opposed to a replacement. Ultimately, the burden rested with Plaintiff to show by a preponderance of the evidence that that the F-150's battery retention system was in a substantially similar condition to when it left the factory. As no competent evidence was introduced on this point, a reasonable jury could not find that there was substantial evidence in dispute. To hold that the F-150's battery was in a substantially similar condition to when

it left the factory would be nothing more than pure speculation. *See, Anthony v. Chevron USA, Inc.*, 284 F.3d 578 (5th Cir. 2002) ("[T]he evidence must be sufficient so that a jury will not ultimately rest its verdict on mere speculation and conjecture.") (quoting *Gulf Coast Real Estate Auction Co. v. Chevron Indus., Inc.*, 665 F.2d 574, 577 (5th Cir. 1982)).

Second, a reasonable jury could not find the battery was in a substantially similar condition when it became dislodged because the evidence showed that the battery was not ejected until after the initial collision had catastrophically damaged the engine compartment. In total, the F-150 suffered three extreme 100+mph collisions during the accident. First, the F-150 hit the Freightliner's tractor. Immediately after, it hit the Freightliner trailer. Then, the F-150 hit Plaintiff's Mercedes.[5] Because the F-150's interior was critically altered by the first impact, Plaintiff cannot show that it was in a substantially similar condition when it was ejected during the second or third collision.

A vehicle which has just sustained a 130 MPH head-on collision is no longer substantially similar to its factory condition. Here, the F-150 collided with the tractor and immediately after hit the trailer and then the Mercedes. The first impact was undisputedly a substantial change. Because the battery ejected only after this first impact, the entire engine compartment of the F-150 was no longer in a substantially similar condition when the alleged failure of the retention system occurred.[6] Plaintiff did not introduce evidence showing that the battery retention system remained substantially similar after the initial impact; therefore, she did not meet her burden.

---

[5] Rasty disputes whether there was a third collision (i.e., whether the F-150 hit Plaintiff's Mercedes). Regardless of whether there was a third collision, the issue does not affect the Court's analysis. The first collision's impact changed the condition of the battery, so whether the battery was ejected on the second or third collision does not affect whether the condition was changed at the time of ejection. Further, Rasty was not designated as an accident reconstruction expert, so he cannot render an opinion on the matter.
[6] Plaintiff could argue that Ford still owed a duty because a multiple-impact collision was reasonably foreseeable. But it is difficult to see how Ford could reasonably anticipate how its designs would fare in a second or third impact after already sustaining an initial, extremely violent collision. Nor was any testimony or evidence offered as to how a cross-member design would fare in a second or third collision when compared to the foot-clamp design.

The damage suffered by the F-150 in the initial collision speaks to another issue that dooms Plaintiff's case: causation. In order for Plaintiff to prevail on a design defect claim, she must show that the defect was the "producing cause" of her injuries. *See Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1044 (5th Cir. 2011). Texas courts define producing cause as one that is "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Id.* (quoting *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007)). While "causation generally is a question of fact for the jury[,]"  if all the facts and inferences point so strongly against causation that no reasonable jury could find causation, then the district court should grant judgment as a matter of law. *Id.* "Proof of causation requires more than conjecture or guess." *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997).

Without supporting evidence, the most a jury could have done would be to guess that the alleged defect was the producing cause of the injury. But Plaintiff's burden was not just to show that the battery was ejected, she must have shown that it was the result of a defective clamp. "The inference of defect may not be drawn . . . from the mere fact of a product-related accident." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 807 (Tex. 2006) (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 602 (Tex. 2004)). Here, there is serious doubt that any clamp could have prevented the ejection because Plaintiff's evidence did not show that the battery was intact when it left the F-150. If the battery or its retention system was torn apart, then it logically follows that the retention system could not have still retained the broken-off pieces of the battery, defeating any design defect claim. Nor were there were any tests done on the retention system's ability to contain a torn-apart battery.

Because it was essential to prove that the design defect was a producing cause, Plaintiff had the burden to show the battery remained intact when it left the F-150. However, Plaintiff did not provide "substantial evidence" in this regard. *N. Cypress Med. Ctr. Operating Co.*, 898 F.3d at 473.

Plaintiff's own witness, Rasty, offered conflicting testimony on whether the battery had remained intact. Rasty initially testified that he believed the battery was intact when it penetrated the Mercedes windshield. Upon seeing video of pieces of the battery on the road, however, Rasty then guessed that the battery may have fallen apart upon impact to the windshield. Even if Rasty maintained consistent testimony, he had not been designated as an expert in reconstruction. Finally, Rasty's guess as to when the battery was torn apart is precisely the sort of "mere speculation" that is insufficient to sustain a claim at trial. *Anthony*, 284 F.3d at 583. The notion that the battery withstood two or three 100+mph impacts and then broke apart only upon penetrating Plaintiff's windshield is simply not supported by any competent evidence. Here, because there is no evidence that the battery was intact upon ejection, there is no evidence that the allegedly defective foot-clamp system failed to stop the battery parts from flying out. As a result, Plaintiff did not meet her evidentiary burden on the producing cause.

### B. Rasty Testimony

Under Texas law, a plaintiff asserting a claim of design defect must establish that: (1) a product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user. *Syrie v. Knoll Int'l*, 748 F.2d 304, 306 (5th Cir. 1984) (citing *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 850 (Tex. 1979)). In addition, by statute, the plaintiff must also establish the existence of a "safer alternative design." *Casey*, 770 F.3d at 331; *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997). A "safer alternative design" is a product design, other than that selected by the manufacturer, that in reasonable probability (a) would have prevented or significantly reduced the risk of the claimant's personal injury without substantially impairing the product's utility; and (b) was economically and

technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable knowledge. Tex. Civ. Prac. & Rem. Code § 82.005.

The statutory requirements in § 82.005 for proving the existence of a "safer alternative design," however, do not supplant the risk-utility analysis Texas has long used for determining whether a product is unreasonably dangerous as designed. *See Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 254–55 (Tex. 1999) ("[P]roof of an available 'safer alternative design,' as defined by statute, is necessary but not sufficient for liability; the claimant must also show that the product was unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use."). In addition to proving a safer alternative, the plaintiff must also prove the design defect rendered the product unreasonably dangerous. *Id.* at 333 ("This court has, in similar circumstances, reversed a design defect verdict when an expert did not conduct a risk-utility analysis of a proposed alternative design") (citing *Smith v. Louisville Ladder Co.*, 237 F.3d 515, 519 (5th Cir.2001)); *see also Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009) (determining risk versus utility balancing as a matter of law).

Proof of a product defect, particularly in automotive cases, requires expert testimony. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) (expert testimony is needed to establish causation in a products liability case where plaintiff alleged that a defect in a truck's fuel and battery systems caused a fire); *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) ("[W]e have consistently required competent expert testimony and objective proof that a defect caused the acceleration . . . these requirements are not peculiar to unintended acceleration cases"). Expert testimony is admissible only if relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U. S. 137, 147, (1999). Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Casey*, 770 F.3d at 332.

9

Here, Rasty's testimony focused on his tests that showed the strength of the retention designs at different angles and forces. Rasty's experiments showed that the cross-member design sustained 232% more force at 90-degrees, 79% more force at 25 degrees, and 25% more force at 15 degrees (where a 0-degree impact would be entirely horizontal (i.e., head-on) and a 90-degree impact would be entirely vertical (i.e., from the ground-up)). (Order, Dkt. 73, at 7). No evidence was provided that the F-150 collided with either the tractor or the Mercedes at 25 degrees, much less at 90 degrees. Rasty suggested that cars tend to lurch downwards during accidents, but again did not reconstruct the accident to provide any evidence that the downward lurch actually occurred. The notion that the F-150 lurched downwards and then collided again at a steep angle was purely speculative. When asked about the 15-degree test, Rasty conceded that it wasn't as feasible to test as the other angles. Rasty admitted in his deposition that he selected the two angles randomly, not because he believed them to mirror those involved in the accident. (Rasty Depo., Dkt. 52-4, at 115). Nor did Rasty or any other witness testify as to the forces involved in the accident's collisions.

As a result, it is impossible to determine if the forces were below or above the threshold forces determined in Rasty's experiments for either design. Texas courts have rejected a plaintiff's claims where the expert did not testify that the forces involved were similar to those of the experiments. *Ford Motor Co. v. Wiles*, 353 S.W.3d 198, 202–03 (Tex. App.—Dallas 2011) (pet. denied). Rasty's experiments, at most, suggest the possibility that the forces involved were precisely within the goldilocks range where the foot-clamp design would fail but the cross-member design would not. With no evidence as to what happened in the actual accident, there is no evidence that the forces or angles involved actually fell within this range. It is not enough that Plaintiff can show the cross-member design was stronger, she must show that it was a producing cause of the injury. As a jury could do no more than guess that the forces involved fell within the correct range, there is no

adequate evidence to show that a safer alternative design would have prevented the battery's ejection.

If an expert offers the test not as a re-creation but as a demonstration of general scientific principles, "it need not pass the substantial similarity test." *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006). Here, Rasty offered an opinion which showed the general scientific principle that cross-member designs perform better at certain forces and angles than foot-clamp designs. As a result, the Court denied Ford's motion to exclude. (Order, Dkt. 73). But this did not absolve Plaintiff of her burden to show that those general principles actually applied to this case. At trial, Plaintiff showed only that the cross-member design was stronger in theory, and could not show it was a producing cause of the accident.

Ultimately, several problems plagued Plaintiff's case at trial. Plaintiff has not shown that the battery retention system was substantially similar on the day of the crash as when it left Ford's possession. Evidence that was introduced showed that the F-150 sustained severe structural damage before the second or third collision when the battery was ejected. Nor could Plaintiff show with competent evidence that the battery itself remained in one piece before ejecting. Finally, Plaintiff's expert's own experiments did not show that the difference in clamp design was a producing cause of the ejection. These shortcomings compel the Court to grant Ford's motion for judgment as a matter of law.

## IV. CONCLUSION

For the reasons discussed above and on the record, Ford's motion for judgment as a matter of law, (Dkt. 126), is **GRANTED**.

**IT IS ORDERED** that Ford's separate motion for judgment as a matter of law on exemplary damages, (Dkt. 125), is **MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's claims are **DISMISSED** with prejudice.

Final judgment will follow in a separate order.

**SIGNED** on March 30, 2023.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE